Good morning, your honors. May it please the court, my name is Mike Wampold. I represent the appellant, Ted Bradford. Detective Scherchligt made sure that Ted Bradford was convicted of a heinous crime, even though it was apparent that he was innocent. In doing so, Detective Scherchligt not only... How so? How so? Was it apparent that he was innocent? It was apparent that he was innocent because he didn't meet the profile of the actual rapist. The profile of the rapist was somebody that knew the victim. They tried to disguise their voice. They said they came for her. Mr. Bradford didn't know her at all. He also didn't meet the physical description. He was much too short. He wasn't muscular. He also knew none of the facts. So if you read... But those are not really your arguments in this case. Your arguments are about two specific Brady points, right? That's right. Because I say that because I think your beginning was a bit of an overstatement, and it's probably irrelevant to your case. So don't get caught up in arguing that. Tell us why there were Brady violations. Okay, well, and I'm going to jump right to the Brady violations, but I do want to make the court aware that we have a motion pending before the court to make a finding, take judicial notice of the findings of fact in the state court action. In the state court action against the state of Washington, it was determined that Mr. Bradford was 100% innocent and that Mr. Sellers, the victim's brother-in-law, was... No, no, and I assume that for the moment. He's been released. You've recovered money against the state? We haven't yet, but that's another story. You've recovered a judgment against the state. I'm sorry. Getting money from the state is harder than a judgment. Part of the reason we wanted to start the way we did, Your Honor, and I apologize if I cut you off. Part of the reason we started the way we did is because we wanted to make sure that the motion is unopposed and hasn't been ruled on by the court. What motion? I'm sorry. What's that? I don't think judicial notice motion. Exactly. And we wanted to make sure the court was... The officer knew he was 100% innocent. No, it doesn't, but it also, I think the motion is important because the findings of fact in the state court action established that the actual rapist was the victim's brother-in-law who was right under Detective Sersely's nose all the time. She was... And look, if you want to keep arguing this... I won't. I can listen to it. I won't. Let me turn to Brady. Did the victim testify at trial? The victim did testify at trial, Your Honor. Did she identify the rapist? She did not. She actually was not able to identify Mr. Brady. But she didn't look at the guy who was there. She was unable to identify him. She didn't look at the guy who was there and say, he looks nothing like the person who did it. Well, her description, though, at the time... I know. I know. There's all kinds of inconsistencies. She did say the guy looks like my brother-in-law, but... Right. Let me jump to the Brady issue. Because I think that's where you've got to spend your time. Fair enough. Thank you, Your Honor. There are two bases for the Brady claim, the first of which is the failure to disclose that the state's smoking gun star witness... All right. That's what I want to know. Yeah. Why was she the smoking gun star witness? I mean, it seems to me she was quite peripheral. She didn't put the guy at... I mean, she had... She didn't say, I saw this guy either committing the rape or at the house the day of the rape or coming out of the... going in or coming out or anything connected to the rape. She actually proved to be critical. We know that. And if you look at the closing argument, it's very clear that the prosecutor relies heavily on her. And the reason is... But she had a confession. Had a confession that was riddled with errors. And that is why we believe if you, particularly if you construe the facts in our favor... But you're not suing this detective about the confession. Well, the confession is a part of the Devereaux claim. Because the... No, wait, wait, wait. You're not claiming that he made up the confession. No. That your client said something different and that he wrote down... That you wrote down that your client did it. No, no, we're not saying that at all. But if you read the confession, it shows that he's innocent. Well, either that or it shows he was lying. I mean, in other words, when he said this didn't happen and that didn't happen, it could be because he didn't know... He didn't get his story straight or it could be because he did know, but he was lying. Right. Particularly construing the facts in our favor. The evidence is that this confession was very problematic. So Detective Shursley... Again, you're getting off target. Let me get back to... You're not here alleging that the confession was fabricated by the detective. No, we are not alleging... So go back to Ms. Searle. Yeah, Ms. Searle. And she was relied on heavily. Let's assume she was relied on heavily. Yes. Let's assume that there might have been... I'm not sure for the reason Judge Berzon says that's the case, but let me assume that for purposes of my question. You were given 20 pages, or your side, not you. The defense was given 20 pages of witness statements. Correct? Right. One of them identifies Ms. Searle as the speaker. The others just say a neighbor. They don't identify Ms. Searle. It says Sue. Okay, Sue. At an address, which is her address. Sue Searle. Okay. The other ones say a neighbor. Correct. And your contention in this case, I want to make sure I understand the contention, is that by failing to say, with respect to the earlier report, the speaker was Sue or Ms. Searle, there was a Brady violation. It's actually much worse than that, Your Honor. Detective Cercily actively tried to make it look like Ms. Searle was a new witness. How? First of all, he interviews her on April 10th. Now, tell me how other than omitting to put her name down. I will. I mean, I understand you're making a jury argument. I want to know the facts. The facts are simply that the fact of your Brady argument is simply that, put it differently, had he identified Ms. Searle as the reporting person each time, you would have no Brady argument, would you? Agreed. Okay. So the Brady argument is that he failed to do so. It's more complicated than that. Because he actively made it look like it was a new witness. He told the court. If you look at the testimony from the pretrial hearing, there's a complaint from Mr. Tate saying this is a brand-new witness that's getting dumped on me. And he asks why. And the prosecutor, very strange, if you look at this, she says, I'm not going to respond to why it was produced late. I'll let Detective Cercily do it. Detective Cercily says, this is a brand-new witness. I never had the opportunity to speak to her before. And I was able now finally to speak to her. On that question, I understand that you're entitled to the opposite assumption at this point. Right. But in all likelihood, he actually didn't talk to her before. No, he did talk to her before. We have sworn testimony that's very specific. I know you have sworn testimony, but I have sworn testimony 12 years after the fact, which was elicited only after you showed him his piece of paper and he said, oh, well, I guess maybe I did speak to her. But all the other evidence seems to be that actually he didn't, that from her and everyone else is that she talked to someone else there but not to him. I couldn't agree more strongly. He could disagree more strongly. Sorry. I couldn't disagree more strongly. His testimony is too specific. I understand. He says he met with her twice before. So his sworn testimony, if I could just answer, his sworn testimony in 2006 and 2010 is that he had two meetings with her before April. He had one meeting at her house. Let me ask you another question. Yes. So we have several problems here. One is, was there actually suppression? Because so tell me what the suppression was. They gave him all the relevant pieces of paper. There's no other conversation you're saying, talking about that they should have given her, right? Oh, yes. I mean, they should have, he should have disclosed, he should have made it clear. First of all, he actively misrepresented. The answer to Judge Berzon's question is. I'm trying to. No. You're not trying to. You're answering a different question. She said, are there any conversations with this witness that were not disclosed? Yes. He says that he talked to a neighbor on October 4th in his testimony. He says he met with her a second time at her place of business. That was not disclosed. There was no disclosure of that. And do you have? There also is not disclosure. Wait. I know you want to cut me off. And I agree because you have a short period of time. I don't want to. Is there any contention in this record that on that other occasion she told him something that was false within Brady? Yes, because she said inconsistent testimony. Her testimony. On the occasion that's not disclosed, which is brand new to me and it's not in your briefs. Right. On the occasion that's not disclosed, do you have anything in the record about what she allegedly said to him on that date? Yes. His testimony is that both times when he met with her, all she said was consistent with his October 4th memo. Okay. So it's no different. So the question is. It's twice. All right. It was twice instead of once. Yeah. So, A, there's the fact that he gave her they gave him all these pieces of paper from which were not a lot. So there were 20 pages. And if you read them, you know, at all carefully, it wasn't too hard to figure out who this person was. In retrospect. Or at the time. Well, whether it was hard or easy, the fact of the matter is there's a statement unattributed to an individual that appears to conflict with a statement attributed to Ms. Searle. Why isn't it a simple matter of saying to the prosecutor who made the statement? And if the prosecutor declines going to the court, this is of no use to us unless we know who made the statement. I don't understand this failure to disclose business. You had all the information a reasonable person would need to cultivate and harvest, if appropriate, whatever evidentiary worth there was in the statement. Your Honor, particularly construing the light most favorable to us, it's much worse than that. Detective Searle, when he gets up and testifies at trial, makes it look like these are two different people. In his trial testimony, he refers to Susan Searle and this meeting he has with her, where she says that this happened in September. And then he makes it look like there's a second neighbor. Tell me where. Tell me. I'm reading his testimony. Tell me where. Tell me. Give me the record site where he says there's a second. Yes, I will, Your Honor. In his testimony, if you look at 1303 through 1306 of the evidence rule, you'll see. Give me the ER sites. Yes. I'm sorry. It's ER 514. And then if you look at 514 and 515 and you continue that on, he makes it. You're talking about this trial in 1996. Right. Exactly. That's the first trial. That's where Mr. Bradford was convicted. I understand. Yes. And so he actively makes it look like these are two different people. And I also want to say that I think that the court is putting in some sort of comparative fault type argument, like Mr. Tate should have figured this out. That's not what Brady says. For Brady to be meaningful, it has to be clear to the defendant. And here where. This is the question. What exactly does Brady require? Does Brady require if you give them information from which it's not. We can have a range of difficulty, but it's not particularly difficult to figure out or at least to hypothesize that there was one person and that it was Sue Searle. Is the requirement that you then say this person was Sue Searle rather than just Sue? Or what exactly should they have disclosed? I think that they needed to disclose that this is Susan Searle. She's the same Sue that was in these other reports. Or they needed to be even more specific and tell Mr. Bradford that she provided inconsistent statements. All right. Now let's get to the inconsistent. All right. The inconsistent is the date on which she saw a person or the dates, the time period, in which she saw the person in the white car driving around. Which is critical. Now, but this is the reason I have a difficulty. We know that at the time, around the time of, well, during some period of time, there was a guy driving around in the white truck, in the white car, who was him and who was exposing himself to women in the neighborhood. And you had several other people who identified this person. So the problem is that the person in the white car driving around in September and the person in the white car driving around in April and the person in the white car driving around later could have all been different people? Is that the problem? Well, yeah, and it wasn't our client. Based on his work history and those other times, it wasn't him. But here's the problem. That wasn't him. She didn't link him to the rape. That's the problem. So, therefore, the relevance of the time has to be connected, I mean, not really to whether she saw him directly connected to the rape, but simply that she saw some suspicious guy in the neighborhood at that time, and we know there was a suspicious guy in the neighborhood. Here's why it's critical. She testifies, by the time she gets to trial, she testified that she saw Ted Bradford looking in the victim's house the day before the rape. That was damning testimony. That's completely different than what she said before. She said before that he'd been there in April or May. The victim didn't even live in the neighborhood in April or May. The statement that identified her as Sue didn't have that in it either. Yes, the statement that said Sue said that it was April or May. No, I understand, but the statement that said Sue doesn't have her saying, I saw him looking into that house. That's right. So you already had an inconsistent statement from her on that.  That's right, if you had known that that was the same person. But it wasn't just Sue. It was Sue at an address. Her address. It was Sue at an address. Her address. Right, but it was not put together by Mr. Tate, and it needed to be. And, Brady, we can't have some sort of comparative fault idea that this is the fault of the defense attorney. The prosecutor needed to – It's not a comparative fault argument. The question for Brady – look, every small piece of exculpatory evidence – I'm not calling this small – that is not disclosed doesn't require automatic reversal. Right. The question is whether or not that would have made a difference. We can fight about the standard. So it's not a matter of comparative fault. Right. The question is if all the statements said Sue and none of them said Searle, you wouldn't be here, would you? No, because Mr. Tate – Okay, but that would have been – He wouldn't have been convicted because Mr. Tate would have been able to effectively cross-examine. Here's the real problem with this case from my perspective, and I understand your difficulty. He was convicted because he confessed. It was a false confession. You may have had a great – you may have a great argument about how they improperly got the confession, but very few people who confess are acquitted. That was not what happened here, though. The defense attorney was very good, and he did great work with the confession. Sue Searle is what sunk him. That is what sunk him. But I'd also like to turn to the Devereux claim because the Devereux claim is completely separate from a duty to disclose. And under the Devereux claim, we should have the ability to get to trial because there's – Okay, so on the Devereux claim, tell me what clearly established law in 1999, when the trial occurred, said that conducting a photo array in this way violated the Constitution. The case that we have for that is the Carrillo decision. And if you look at that Ninth Circuit case, it establishes that that was a bad identification and that that was clearly established at the time. It establishes at the time that as a matter of evidence, we didn't – but does it establish a Fourth Amendment – a constitutional violation? It does. The Carrillo decision is completely on point, and it says that that's a Devereux violation. The fact that it wasn't disclosed, the photo identification, the way that it was done, this was done completely against Yakima city rules. He was – it was impermissibly suggestive. Tell me why exactly it was impermissible. We'll give you about one more minute, and then we'll have to stop. The city rules required him to say, hey, you know, it's important to prove people are innocent. We don't even know that this person is in the photo lineup. I mean, really, the rules required them. But what's the constitution? The constitutional violation here was that he told her, hey, we have somebody in custody. The person matches the description of who you described was driving in the neighborhood before. They were in the same car, and then shows the lineup, which is impermissibly suggestive. There are a lot of prophylactic rules that the courts have imposed in terms of the reliability of identifications. Right. They don't mean per se that if a detective tells a witness that we have somebody that we've just arrested and matches the description, that it's necessarily unreliable. But why wasn't the circumstances of the identification, the lineup and so forth, all a matter of pretrial exploration? Why does this come up so late in the game? And the reason is, is because it was not disclosed. So, again, you get back to Brady. But it was disclosed. I assume the identification we're going to have – Ms. Serlin's going to identify your client. Right. But he didn't know – there was no disclosure to Mr. Bradford of the way they had done the identification. Well, whose fault is that? That's the police officer. I mean, if somebody's going to make an in-court – excuse me. If somebody's going to make an in-court identification of my client, I want to know, were they shown a photo array? Were they shown a lineup, et cetera, et cetera? And I want a hearing on the circumstances of that show-up. So the court could determine whether or not, despite these imperfections, there's sufficient reliability for the identification to come into evidence. Why wasn't that done? And part of the problem was that this witness was sprung on him late, and that was purposeful. And particularly construing the facts in the light most favorable to us, he knew about this witness in April. We think it was sooner, but at least by April. He sat on it and didn't disclose it at all until right before trial on the eve of trial. Did he disclose your responsibility, the detectives, or is it the states? It's the detectives. Well, maybe. Let me ask – you're over time. I want to ask you, is Carrillo your best case? Carrillo and – Carrillo is a case where the person looking at the photo array picks out somebody other than the defendant, and the detectives never tell the defendant. Right, but I – And do you think that clearly establishes that at this time, saying to somebody beforehand – Right. We have five photos here. We think one of them is the guy who violated the Constitution. Right. You were asking the question of did Devereaux – was it established under Devereaux at the time, and the Carrillo decision says that. Yeah, no, because we have to have a case under 1983 to a high level of specificity that says what you were doing violated the Constitution. Carrillo is your case. Carrillo, and, Your Honor, for the inconsistent witnesses, we have the case that you relied on. Devereaux is the photo array case. My understanding is that your Devereaux claim doesn't depend on the photo array. It doesn't. To some degree, but not that much. The better part of the Devereaux claim is the decision that you joined in just recently. Sometimes I'm wrong. Well, you're not this time. I was right that time. Tell me when. The Spencer decision that recently came out, we've written a 28-J letter on it, and you joined in, is directly on point, and that was a change in the law. See, it's not directly on point. Okay. It's helpful to you. On the inconsistent statements, it's incredibly helpful. That's right. Now, I didn't think your Devereaux claim was on the inconsistent statements. Oh, it is, Your Honor. That's a huge part of our Devereaux claim. It's a combination of all of that plus what he knew at various times. Exactly. Essentially. All right. Your time is up. Thank you so very much. We'll give you a minute in rebuttal. Thank you, Your Honors. Thank you. May it please the Court. Tom Miller for Detective Joe Shursley, who's here in the courtroom as well. Your Honor, Judge Berzon, you hit it right on the head. There is no evidence in this record of any suppression of material evidence that would have changed the outcome of this case. What we have is a detective who, on plaintiffs accepting this October 4, 1995, interview of Ms. Searle as a contact between Detective Shursley and Ms. Searle, which we know from his testimony in the criminal trial, it was not. If we look at his report where he mentions a woman introducing herself as Susan Searle, and that's in his May 10, 1996 report, if we look at her trial testimony in 1996 where she says she met Detective Shursley later on in April when he was over at the residence and they talked, but even if we accept that somehow they met in 1995 and Detective Shursley just neglected to include her name in that memorandum, which was an inner office memo for the police department, that does not rise to the level of a Brady violation. Significantly . . . The name was in another memo that they did get. Exactly. Not Searle, but Susan and the address. Exactly. Officer Hittner's report is where we start, and in that report we've got a description of a sue at 3008 Barge who flushed a peeping tom out of her bushes. Then we've got the October 1995 memo where a neighbor flushed a peeping tom out of the bushes and saw . . . An unidentified neighbor. An unidentified neighbor, and saw a white car driving around aimlessly. And that is also significant . . . Did the first one say that there was a white car driving around aimlessly? No, not in Hittner's report. Okay. I mean, you had to put the puzzles together. You had to say that the sue at 3008 or wherever the address is who said there was a peeping tom, and the neighbor who said there was a peeping tom and also a white car was the same person, and that person is Susan Searle who later on said that the white car was not in May but in October, so she had a contradiction, and therefore you want to cross-examine her and demonstrate that she changed her story about when she saw the white car. And that was very easy to do, and it was very simple to do, and under the Mielke case . . . When was Susan Searle's existence revealed relevant to the trial? Because the argument today seems to be a little bit different than I understood it. The argument as I understood it was that there was a nondisclosure in these papers, but the argument I hear today, and I've been trying to leaf through the record to find it, is that your client lied about this and therefore exacerbated the Brady violation. There's no evidence to that in the record. But first of all, when was it revealed? So it was revealed in . . . About Susan Searle and that she was going to testify and anything about her. It was revealed after, when Detective Shursley gave his May 10, 1996 report to the prosecution, and I believe that that was at the 3.5 hearing that this came up, was when there was a name put, Susan Searle. Relative to the time of the trial, when was it? The trial started in September, if I believe, possibly June of 1996. All right, so it wasn't like the day of the trial. No, and Judge Rice pointed that out. And then when was the 20-page packet given to them? That I don't have immediately right now, and the key point being that Mr. Tate, the criminal defense attorney, never requested more time so that he could do anything with respect to Ms. Searle, and he absolutely could have done that. Judge Rice noted that in his order. I mean, there were many prophylactic measures that could have been taken to handle this late disclosure. Did they know what Ms. Searle was going to say? Well, yes. It was in Detective Shursley's report, and he had an intertranscribed statement that was attached to that report that he had turned over. Everything in this case was turned over, and that gets us back to that Milky case where they say if the court has enough, if the detectives or the prosecutor turns over enough information to be able to ascertain the supposed Brady material on your own, there is no Brady violation, and that's what we have here. Can we go back to these statements because they appear in different contexts, right? One is an internal police report by, I take it, the investigating officer. It was generated by Shursley. Right, but he's reporting what someone else told him. That's exactly correct. And then on another occasion, he's reporting what Ms. Searle told him. Correct, in May of 1996 report. Is there, with respect to the first report, is there any evidence in this record that your client knew that the person who had reported to the officer was Ms. Searle? No, not at that time. Well, wait a minute. But he did know at some point later, did he not? Correct. In 2006, when he told him. At least when he interviewed her, she said, I already talked to an officer. Yes. But he also, I mean, the problem is that he did say in 2006 and 2010, even though it may well not be true, that he met with her in October. Correct. Twice. Right. He said that. So for present purposes, we have to accept that. So your answers are inaccurate in terms of what we have to rule on now, right? We have to go forward at this point on the premise that he, in fact, met with Susan Searle twice in October and then again in April. Not twice in October. Just once. There's no evidence that he met with her twice. But he did say something about going to her place of business, did he not? He did, but that not necessarily, he didn't say anything about that being in October. So let's assume that he had meetings with Ms. Searle, put aside, leaving off the names on the statements, that were not disclosed. Is that a Brady violation? And if so, why shouldn't we reverse based on it? It's not a Brady violation. Every meeting that he had with her has been, he disclosed. This notion that there's some mystery. Every meeting that he had with her was disclosed at or before the time of trial? Correct. Well, wait a second. When? I mean, the document that you're relying on, there were two documents from October, right? His October 24 memo as well. This Brenda George's and his. But neither of them say that this officer met with her. Right. So he didn't disclose that he met with her. That's correct, because we know he didn't. But even if we accept that he did. But for present purposes, I mean, there's no use running from it, because he said he did. Correct. Okay. So then you look at whether these pieces of the puzzle were there to be put together, such that there was no Brady violation, because they had all of this information. I mean, so your correct answer to Judge Hurwitz was no, he never did reveal that he met with her, but it doesn't matter. But not that he didn't, because he did say that he did. He didn't reveal that. I think you lost me on that one. Okay. But what Judge Berzahn is saying is the defense did not know at the time of trial that these other meetings had occurred, this other meeting had occurred. They had information where they easily could have ascertained that. That's a fine, you're a lawyer, so you give me a lawyer answer. But the answer to the question was they were not told at the time of trial that this other meeting had occurred. But any meeting had occurred. Okay. Any meeting. Any meetings other than the ones disclosed in the documents. Right. Okay. So my question is still, is that nondisclosure a Brady violation? No. There's no evidence that there was any substance of anything discussed with her at all, even if we assume that there was some mystery meeting that occurred. So there's no, the mere fact of the meetings in your view is not exculpatory or helpful to the defense? Correct. And what about, let's assume for some reason we didn't agree with all this about the discretion. Was there then, and we get to Brady prejudice, which is a sort of odd kind of prejudice. The case law seems to be, to my mind, to sort of confuse the question of what should have been revealed because its materiality was evident at the time and what retrospectively would have made a difference. I don't know if there's, do you think those are two inquiries or one? I think it's one. I mean, the way that I've, the case law as it reads, it requires that there be a reasonable probability that the jury would have reached a different conclusion had the evidence been disclosed. Well, some of it says that, but the original Brady, I mean, but you also have to figure out what should have been revealed prospectively. And if you're a prosecutor and you're trying to decide what you need to reveal, you're not going to know how the trial is going to unfold. So it has to be a prospective question about what is, you know, what's material looking forward, not what was prejudicial looking back. So maybe there were two inquiries. But, and I know the case law messes this all up. But what, looking at it one way or the other, what can you tell us about its either likely impact going forward or actual impact going back? There was no, this would have had no impact. Even if we assume he met with her in October. She said that the car was driving around in April, which was around the same time that she saw the peeping Tom that first of all, Mr. Tate had that information by virtue of the memos and he could have connected in. No, I'm asking you to assume otherwise right now. And it wouldn't have changed anything. This is a case about a confession. He confessed to this crime. The court of appeals has upheld that confession. I guess that's the problem with this case. They're collaterally stopped from challenging it. And that's. Is that true though? That's the part I don't get. How could they be collateral to stop from? I mean, I understand it's not before us, but it's, it's the elephant in the room. I mean, if, if it is in fact a false confession, I mean, even if it's not an unconstitutionally false confession, the fact that it's false seems pertinent. No. Well, there's no evidence in this record that it's a false confession. All we have is that he was acquitted in 2010. There is no evidence that this confession was false. And sort of like your colleague, I suggest you not go there. You've got a finding in a state court that you may have it on appeal and other things like that. But you, you've got to, you know, this is a case where a reasonable person could assume that the confession was false. Well, and it brings us back to what a reasonable officer in detective Shirsley's position, would every reasonable officer as the Al-Kid decision requires us to analyze qualified immunity, would every reasonable detective in 1996, having secured a confession from a gentleman that had very consistent aspects about the rape. They also had a lot of inconsistent. Absolutely. But that's a subject for cross-examination for the defense counsel. That's not where the detective plays judge and jury. That's the Brady claims. We look under Brady claim for clearly established. I mean, didn't it turn out or did it turn out that some other officer had met with him in the meanwhile and told him some of the stuff that turned out he testified to? No, there's an, I think you're talking about Ruggsegger who did the polygraph. But during the polygraph, he asked about handcuffs. That was it. Asked about what? Handcuffs. I thought also about the mask. Not the mask she wore, but the stocking. No. And so it's in Ruggsegger's report where he mentions that he asked about handcuffs. He said, what about the handcuffs or something. I want to ask you about the photo array, what you guys describe as the photo montage. You agree that telling somebody beforehand that the person you have in custody is among the five and implying you're pretty sure it's the person who did it is not the appropriate way to conduct a photo array? I don't know about appropriate. I wouldn't say it's ideal, just as Judge Rice did. However, the case law requires for anything about this photo array to have any legs in terms of creating an issue of fact that Detective Shursley had done far more than that. And this Carrillo case, for instance. Carrillo is quite different. Carrillo, the witness identifies somebody else and then they keep pressing him and he finally identifies the defendant and they never tell anybody that he identified somebody else. I understand that. But I'm trying to figure out where evidentiary problems lapse over into constitutional problems here with photo montages. And I would say not there because there is no case law that Mr. Bradford's counsel has cited to stand for the proposition that saying we have someone in custody and he's in this array. Again, she's got a one in six chance of picking the person. She picks Bradford. But there's no case law that says you can't do that. Assume it's not a 1980. It's a Devereux claim. So if somebody really fabricated evidence, we wouldn't look for a case closely on point. Right? So the question is, is this fabrication of evidence? No. Not at all. What at the first trial? Was the fact that there was a photo array disclosed? Ms. Searle testified that she had picked out. But in advance there was no submission to the defense of the actual array? No, there was. Oh, there was. Yeah. So they got the array. Could they have made an inquiry about circumstances but they didn't? Is that what happened? In other words, was there anything given them about anything surrounding the array, anything that occurred at the time of the array? They knew that Ms. Searle had picked somebody out of the array. And they had the array. And that was ripe for cross-examination. And they had the array. Correct. And that they could have deposed Ms. Searle ahead of the trial. They could have done any number of things to find out, or Detective Shursley to find out more information about that. And there certainly was no motion to suppress an in-court identification. Correct. Okay. Your time is up. Thank you. Thank you very much for your argument, sir. Thank you, Your Honors. Very briefly, please. I want to make clear. I'm sorry? Very briefly. Yes. I want to make clear that both our Brady claim and our Devereux claim is based on an active lie, not just an omission to disclose. What's the active lie? If you look at ER 0596, Detective Shursley then, when the court is asking him, why didn't you disclose this witness earlier, he says, in doing up the investigation on April 10th, I was able to contact Susan Searle. She was on the original report as a possible witness. At that time, I had not had time to contact her. So he makes it look like it's a brand-new witness. Then, if you look at his – Why does that look like it's a brand-new witness? Because he – Read me the sentence again. Well, his report also says that, that a brand-new witness. She came over and identified herself as Susan Searle. She introduced herself. But he says, I hadn't had time to talk to her before. Brand-new witness? Well, he's – yes. Those words? You say, at that time? Pretty close. It says, she came and introduced herself. Well, but he said on the original report, and then he says, at that time, I didn't have time to contact her. He said he hadn't had time to contact her. But at that time, he'd met her twice. Read me back that statement again. Yeah. Read me back what's the practice. He says, in doing up the investigation on April 10th, I was able to contact Susan Searle. She was on the original offense report as a possible witness. At that time, I had not had time to contact her. Okay. My point is that at that time could have been at the original report, couldn't it? But then he makes it look like he had never met with her. That was the answer to the judge's question. I didn't even say that. I mean, honestly, I read through the material. I don't – no, I didn't understand him to be saying I never met her before. That's why he's saying he didn't disclose her earlier. He didn't say that. Yes, he did. That was the answer to the question. The question from the court. What was the answer to the question? The court was asking, why didn't you disclose this earlier? His answer is she's basically a brand-new witness to me. That's essentially his answer. Exactly. Where are we now? Yes. It is on – Is this what you just read me? Yes. That's the part that says she's a brand-new witness? Well, there's also the report. If you look back at the report from April, which I can give you that side as well, that's ER 0652. And if you look at 0652, it makes it look like it's a brand-new witness as well. And then could I go on and talk about the trial testimony? Very briefly. Okay. The trial testimony, if you look at page – it's evidence ER 0514 at 1303, he talks about a neighbor. And then later, if you look at evidence ER 0515 at 1306, he starts talking about Susan Searle. So he makes it look like these are two different people. And he knows it's the same person. He actively is trying to misrepresent and make it look like these are two people. So he's prohibiting the defense lawyer from knowing that this is the same person who's giving completely inconsistent statements. And counsel says it's not prejudicial. It's incredibly prejudicial because her first statement was completely unhelpful to them. For example, in the April 10th statement, he says, I spoke with a female in the area who identified herself as Susan Searle. That's the assertion that he never met her before? Yeah, he makes it look like he met her twice. That's sort of police talk. She gave me her name as Susan Searle. I don't understand why that proves that he never met her before. Your Honor, construing the light most favorable to us, if he's trying to hide the fact that he's met her twice, once at her workplace, once at her home, and she's given testimony. I really think you could have done better by this case if you don't overstate things. I mean, that just doesn't seem a plausible reading of that. I apologize, Your Honor. I'm doing the best I can. The Tennyson decision, I'd like to mention quickly, that decision says exactly what we're saying here, Tennyson 570. The Tennyson decision has another problem, which I've never understood where this deliberate indifference standard comes from and why we're applying a different standard in 1983 than we do in trial, but we do. Right, but the Tennyson case, why I'm citing it. So you have another problem, which is you have to prove for the O'Brady violation that it's deliberately indifferent for some reason. Right, and there's case law that makes it clear you don't have to prove intent after Tennyson, but the Tennyson, the part I want to talk about is the fact that the Tennyson decision, again, 570, F3rd, 1078, says very clearly that it's not, it doesn't, Brady is not meaningfully kept if you just bury something in a police file. You have to actively tell the prosecutor. So that's what the Tennyson case is on all fours here. Except that the burying was fairly different. All right. Thank you very much. The case of Bradford v. Sherslick is submitted. We will go on to Weiss-Jenkins v. Utrecht Manufacturing. Thank you, Your Honors.
judges: Berzon, Hurwitz, Dearie